IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CV-185-D

COLORADO BANKERS LIFE )
INSURANCE COMPANY, )
 )
         Plaintiff, )
 )
    v. )      **ORDER**
 )
ACADEMY FINANCIAL ASSETS, LLC, )
 )
         Defendant. )

On June 23, 2020, Colorado Bankers Life Insurance Company ("CBL" or "plaintiff") filed an amended complaint against Academy Financial Assets, LLC ("AFA" or "defendant") requesting damages for breach of contract and attorneys' fees under North Carolina law [D.E. 19]. According to CBL, AFA borrowed nearly $40 million and failed to pay it back. See id. AFA claims its performance was excused based on various affirmative defenses. See [D.E. 22]. On May 10, 2021, CBL filed a motion for summary judgment [D.E. 59] and supporting documents [D.E. 60, 61, 62, 63]. On June 22, 2021, AFA responded in opposition [D.E. 66, 67, 68]. On July 6, 2021, CBL replied [D.E. 69, 70]. As explained below, the court grants CBL's motion for summary judgment.

I.

Greg E. Lindberg ("Lindberg") owns CBL and three other domestic insurance companies (collectively, the "NC Insurance Companies"). See [D.E. 61] ¶ 1; [D.E. 67] ¶ 1. Lindberg also has a financial interest in non-insurance operating companies, holding companies, financing companies, and other related companies (the "Affiliated Entities"), including AFA. See [D.E. 61] ¶ 3; [D.E. 67] ¶ 2. These entities entered into a series of intercompany transactions. On June 27, 2019, the Superior Court of Wake County ordered the NC Insurance Companies—including CBL—into rehabilitation, a form of insurance receivership, pursuant to Chapter 58 of the North Carolina

General Statutes. See [D.E. 61] ¶ 2; [D.E. 67] ¶ 2. That same day, the NC Insurance Companies entered into three interrelated agreements with Lindberg and the Affiliated Entities: the Memorandum of Understanding (the "MOU"), the Interim Amendment to Loan Agreement, and the contract at issue in this case, the Revolving Credit Agreement ("RCA"). See [D.E. 61] ¶ 4; [D.E. 67] ¶ 4.

On June 27, 2019, AFA and CBL executed the RCA. See RCA [D.E. 62-3]; [D.E. 61] ¶¶ 4–6; [D.E. 67] ¶¶ 4–6. The RCA reduced to writing a $15 million loan that CBL made to AFA, increased the credit line to $40 million, and structured the loan as a revolving credit line. See [D.E. 61] ¶¶ 7–8; [D.E. 67] ¶¶ 7–8. Under the RCA's terms, CBL agreed to make a $40 million credit facility available to AFA from which AFA could request loans to be used for certain purposes specified in the RCA. See RCA ¶¶ 1(a), 4(j). Interest would accrue on the daily outstanding credit balance at a rate of 5% per annum. See id. ¶ 1(b). And an "event of default," as defined in the RCA, would trigger a higher interest rate of the lesser of 12% per annum or the maximum amount allowed by law. See id. ¶ 1(c). The RCA defines various events of default, including where the MOU's restructuring plan "terminates or is not effective as of March 31, 2020," where AFA "fails to pay any principal of the Credit Balance" when due, or where AFA "fails to pay any interest or any other sums payable . . . within ten (10) days after any such" sum is due. Id. ¶ 6. The RCA provides that "[t]he Credit Balance and all accrued, unpaid interest thereon, if any, will be due and payable on June 30th, 2020 (the 'Maturity Date')." Id. ¶ 1(d). The RCA also allows CBL to accelerate the indebtedness, including accrued and unpaid interest, upon the occurrence of an event of default. See id. ¶ 7(b).

On April 1, 2020, when the restructuring specified in the MOU had not occurred, CBL filed suit against AFA for breach of contract in Wake County Superior Court. See Compl. [D.E. 1-3]. On May 4, 2020, AFA removed the case to federal court based on diversity jurisdiction. See [D.E. 1]. On July 23, 2020, CBL filed an amended complaint alleging an additional cause of action for

2

breach of contract based on AFA's failure to pay the outstanding indebtedness by the June 30, 2020 maturity date. See Am. Compl. [D.E. 19] ¶¶ 23–28. On August 6, 2020, AFA answered the amended complaint. See [D.E. 22]. On May 10, 2021, after discovery, CBL moved for summary judgment, see [D.E. 59], and filed documents in support. See [D.E. 60, 61, 62, 63]. AFA opposed the motion [D.E. 66, 67, 68], and CBL replied [D.E. 69, 70].

II.

The court is exercising diversity jurisdiction, and the parties agree that North Carolina substantive law applies. In applying North Carolina substantive law, the court "must determine how the Supreme Court of [North] Carolina would rule." Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020); Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from the Supreme Court of North Carolina, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[1]

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus.

---

[1] North Carolina has no mechanism for certifying questions of state law to the Supreme Court of North Carolina. See Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013).

3

Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. It is insufficient to show a "mere . . . scintilla of evidence in support of the [nonmoving party's] position . . .; there must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." Id. at 252. "[T]he burden of establishing the affirmative defense rests on the defendant." Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007).

In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Scott, 550 U.S. at 378. Nevertheless, the court is not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party." Anderson, 477 U.S. at 251 (quotation omitted). "[C]onclusory statements, without specific evidentiary support," do not create genuine issues of material fact. Causey v. Balog, 162 F.3d 795, 802 (4th Cir. 1998). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson, 477 U.S. at 247–48.

III.

CBL's breach of contract claims are premised on two events of default. The first event of default is the failure of the restructuring contemplated in the MOU to be effective as of March 31, 2020 (the "restructuring default"). See RCA ¶ 6(j). The second event of default is AFA's failure to repay the its indebtedness by the maturity date, June 30, 2020 (the "repayment default"). See id. ¶¶ 1(d), 6(a). CBL moves for summary judgment, arguing it is entitled to judgment as a matter of law concerning (1) the merits of its claims, (2) the damages it is owed, and (3) the amount of attorneys' fees to which it is entitled. See [D.E. 60] 4–15. AFA disagrees. See Resp. Opp'n [D.E. 66] 2–10.

4

A.

Counts one and two each allege breach of contract based on the restructuring default and the repayment default, respectively. See Am. Compl. ¶¶ 17–28. AFA asserts various affirmative defenses. See Resp. Opp'n at 2–8.

Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000); see Wells Fargo Ins. Servs. USA, Inc. v. Link, 372 N.C. 260, 276, 827 S.E.2d 458, 472 (2019) (per curiam); Cantrell v. Woodhill Enters., Inc., 273 N.C. 490, 497, 160 S.E.2d 476, 481(1968); Montessori Children's House of Durham v. Blizzard, 244 N.C. App. 633, 636, 781 S.E.2d 511, 514 (2016).

AFA does not contest that the RCA is a valid contract and asserts no defenses to formation, allegations of fraud, or claims that the contract terms at issue are ambiguous. See [D.E. 61] ¶¶ 5, 16; Resp. Opp'n; [D.E. 67] ¶¶ 5, 16. AFA does not claim that the restructuring occurred by March 31, 2020. See [D.E. 61] ¶¶ 26, 28; [D.E. 67] ¶¶ 26, 28.[2] Likewise, AFA does not claim that it repaid the revolver loans. See [D.E. 61] ¶¶ 24–25; [D.E. 67] ¶¶ 24–25. Rather, AFA asserts affirmative defenses seeking to excuse its performance and contends that genuine issues of material facts exist concerning whether CBL failed to mitigate damages, obstructed the purposes of the agreement, waived payment, or committed a prior material breach. See Resp. Opp'n at 2–8.

AFA asserts the same general facts and arguments as defenses under failure to mitigate damages, obstruction of the purposes of the agreement, waiver of payment, and prior material breach. See Resp. Opp'n at 2–8. Essentially, AFA contends that CBL prevented AFA from being able to repay the loan by (1) delaying or refusing draws on the loan and rejecting proposed third-party

---

[2] AFA is litigating the enforceability of the MOU in North Carolina state court. See [D.E. 67] ¶¶ 26, 28. Regardless of whether the MOU is an enforceable agreement or an "agreement to agree," the failure of the restructuring contemplated in the MOU was an event of default under the RCA. See RCA ¶ 6(j).

5

financing agreements, and (2) demanding repayment of the credit line in order to "intentionally manufacture[] financial pressure on AFA" and despite having "sufficient cash and no need for liquidity." Resp. Opp'n at 1–8.

First, AFA alleges CBL materially breached the RCA before AFA defaulted by improperly delaying or denying requests for advances. See Resp. Opp'n at 6–8. For a prior material breach to excuse a defendant's performance, a defendant must show that the plaintiff materially breached a valid bilateral contract before the defendant's alleged breach. See Williams v. Habul, 219 N.C. App. 281, 293, 724 S.E.2d 104, 112 (2012); McClure Lumber Co. v. Helmsman Const., Inc., 160 N.C. App. 190, 198, 585 S.E.2d 234, 239 (2003). However, continued performance or acceptance of performance by the nonbreaching party constitutes waiver of the right to consider that party's own performance excused. See Wheeler v. Wheeler, 299 N.C. 633, 640, 263 S.E.2d 763, 766–67 (1980); Indus. Lithographic Co. v. Mills, 222 N.C. 516, 519, 23 S.E.2d 913, 914–15 (1943).

The RCA is a valid bilateral contract, and AFA argues CBL's supposed denials and delays occurred before both events of default. Here, the existence of a prior material breach depends on whether a genuine issue of material fact exists concerning conduct that would constitute CBL's prior material breach of the RCA.

AFA alleges that CBL improperly delayed and denied requests for approvals and thereby obstructed the purpose of the RCA and excused AFA's further performance under the RCA. See Resp. Opp'n at 6–8. CBL responds that it never denied a request, see [D.E. 60] 5, and maintains that any delays were insubstantial and generally consisted of Special Deputy Rehabilitator Mike Dinius requesting more information to evaluate the request as required by the RCA. See id. at 6. After the alleged denials and delays, AFA continued to draw on the credit line. AFA has not delineated what portion of the damages is attributable to each specific delay or alleged rejection. Moreover, no evidence suggests that the delays or alleged denials, even if they occurred, would constitute a material breach under the RCA because the RCA requires only that CBL lend the revolver funds for

6

specific purposes. See RCA ¶ 4(j). Regardless, AFA waived any such breach by continuing to perform and accept performance under the RCA. See, e.g., Wheeler, 299 N.C. at 636–41, 263 S.E.2d at 765–67. Thus, the defense fails.

Next, AFA claims it is excused from performing because CBL failed to mitigate damages by not approving third-party financing agreements that would have allowed AFA to repay the revolver loan. "[F]ailure to mitigate damages is not an absolute bar to all recovery; rather, a plaintiff is barred from recovering for those losses which could have been prevented through the plaintiff's reasonable efforts." Smith v. Childs, 112 N.C. App. 672, 683, 437 S.E.2d 500, 507 (1993) (emphasis omitted); see Stimpson Hosiery Mills, Inc. v. Pam Trading Corp., 98 N.C. App. 543, 551, 392 S.E.2d 128, 132–33 (1990). Mitigation of damages, also referred to as the doctrine of avoidable consequences, focuses on the nonbreaching party's failure to use reasonable efforts to minimize the harm after the defendant's breach. See Miller v. Miller, 273 N.C. 228, 239, 160 S.E.2d 65, 73–74 (1968). To show failure to mitigate damages, a defendant must show that the plaintiff failed to use ordinary care to mitigate damages sustained as a result of the defendant's breach of contract and demonstrate with reasonable certainty what damages would have been minimized or avoided. See id. at 240, 160 S.E.2d at 73–74; Gibbs v. W. Union Tel. Co., 196 N.C. 516, 146 S.E. 209, 213 (1929); Thermal Design, Inc. v. M & M Builders, Inc., 207 N.C. App. 79, 89–90, 698 S.E.2d 516, 523–24 (2010); Smith, 112 N.C. App. at 682–83, 437 S.E.2d at 507. Mere speculation concerning mitigation of damages does not support this affirmative defense. See State Health Plan for Tchrs. & State Emps. v. Barnett, 227 N.C. App. 114, 118, 744 S.E.2d 473, 475–76 (2013).

AFA claims that CBL's refusal to approve third-party financing put it into a "catch 22" and caused AFA to be unable to repay the credit line. Resp. Opp'n at 4. Although the RCA required AFA to get CBL's approval to enter into a third-party financing agreement, which AFA claims would have allowed it to repay the loan, CBL declined to approve such an agreement. See Resp. Opp'n at 4; RCA ¶ 5(c) (non-subordination covenant). The non-subordination term, however, was

7

clear when AFA executed the RCA and is a standard contract term in a debt agreement. CBL did not have a duty to approve third-party financing agreements that would subordinate its debt, and such rejections do not constitute a failure to mitigate. See Smith, 112 N.C. App. at 683, 437 S.E.2d at 507–08 ("[P]laintiff need not pursue a particular corrective measure if a reasonable person would conclude the measure was imprudent, impractical, or would likely be unsuccessful."). AFA has failed to demonstrate a genuine issue of material fact concerning which portion of the damages approval of third-party financing would have avoided. Moreover, AFA has not demonstrated how CBL's alleged failure to approve third-party financing agreements excuses its liability for the restructuring default. Even if AFA's mitigation arguments lessened the damages owed under the repayment default, CBL already had accelerated AFA's debt after the restructuring default, and AFA owes CBL the outstanding credit balance and accrued and unpaid interest based on that breach. Thus, the defense fails.

Next, AFA argues that CBL "obstructed the purpose of the [RCA]" when it allegedly rejected the third-party financing opportunities that AFA presented. Resp. Opp'n at 5. A party generally cannot recover for nonperformance where that party prevented the performance. See Goldston Bros., Inc. v. Newkirk, 233 N.C. 428, 432, 64 S.E.2d 424, 427 (1951); Harwood v. Shoe, 141 N.C. 161, 53 S.E. 616, 616 (1906). In order to excuse nonperformance, "the conduct on the part of the party who is alleged to have prevented performance must be wrongful, and, accordingly, in excess of his legal rights." Goldston Bros., 233 N.C. at 432, 64 S.E.2d at 427 (quotation omitted).

AFA's obstruction arguments are similar to those supporting its mitigation of damages defense. AFA claims that CBL obstructed the purpose of the agreement by refusing to authorize third-party financing agreements and "intentionally manufactured financial pressure on AFA" by demanding repayment of the loan "when CBL has sufficient cash and no need for liquidity and during the worst credit market in decades." [D.E. 62-10] 4; see Resp. Opp'n at 1–6.

8

A lender insisting on loan repayment upon an event of default does not cause that same default. Moreover, whether the lender needs the money is irrelevant.[3] CBL's need or lack thereof for repayment does not affect its rights under the loan contract or the legitimacy of CBL enforcing those rights. Even if CBL did not need the money, AFA's performance under the contract is not excused. Even viewing the record in the light most favorable to AFA, CBL did not act wrongfully by exercising its rights under the RCA, by not approving third-party financing that would subordinate its loan, or by accelerating the indebtedness after AFA's default. Thus, the defense fails.

Next, AFA argues there is a genuine issue of material fact concerning whether CBL obstructed AFA's ability to repay and thereby waived its rights under the contract by (1) rejecting third-party financing agreements and (2) improperly delaying or denying draws. "A party may waive a contract right by a voluntary and intentional relinquishment of a known right." Nye v. Lipton, 50 N.C. App. 224, 230, 273 S.E.2d 313, 317 (1980).

AFA's arguments for its waiver defense track those it raised about mitigation of damages and obstruction of purpose. AFA's waiver defense, however, is even weaker than its earlier arguments. Simply put, CBL did not waive its rights to repayment by exercising its rights under the RCA to prevent subordination of its debt and ensure that draws on the credit line conformed with the purposes specified in the RCA. A party may enforce its rights under one part of a contract without waiving its rights under another part of the contract. Thus, the defense fails

In summary, AFA does not assert any defenses to contract formation or any other reasons that excuse its performance under the contract. Although AFA and CBL disagree on some of the facts

---

[3] AFA and CBL disagree about whether CBL needed liquidity when it accelerated the RCA after the restructuring default in April 2020. Compare Resp. Opp'n at 1 ("CBL has sufficient cash and no need for liquidity.") with [D.E. 60] 10 n.5 ("[I]t is demonstrably false that CBL presently has no issues with liquidity for its policyholders."). However, this disagreement does not create a genuine issue of material fact. CBL's need for the money is irrelevant to whether CBL was entitled to accelerate the loan upon an event of default or whether doing so caused AFA to default.

9

and characterizations of the parties' performance under the RCA, the disputed facts are not material. Even viewing the record in the light most favorable to AFA, AFA breached the RCA. Moreover, AFA has not produced evidence showing that there is a genuine issue of material fact on the question of breach of contract and has not asserted any defenses sufficient to allow a jury to excuse AFA's performance. Thus, the court grants summary judgment to CBL on its breach of contract claims.

B.

CBL seeks damages of the outstanding principal amount and accrued interest as calculated under the RCA. See [D.E. 60] 14–15; [D.E. 69] 3–4. AFA responds that a genuine issue of material fact exists concerning damages. See Resp. Opp'n at 8. Specifically, AFA claims it owes less than the amount stated in CBL's motion for summary judgment because AFA is entitled to credit for later payments. See id. at 10.

CBL replies that the amount AFA owes is reduced by the payments AFA made after CBL filed its motion for summary judgment. See [D.E. 69] 3–4. Thus, the dispute is not material. AFA gets credit for later repayments. CBL's calculations otherwise conform with the terms and rates in the RCA, and AFA does not assert an alternative damages amount, propose an alternative method of computing damages, or cite any specific problem with CBL's calculations. Other than vague assertions that the damages are less than CBL claims, AFA does not assert any specific problem with CBL's damages calculation. AFA's vague assertions do not create a genuine issue of material fact. Thus, the court need not have a trial concerning damages.

C.

CBL seeks attorneys' fees and costs. See [D.E. 60] 15. AFA responds that a genuine issue of material fact exists concerning attorneys' fees and costs. See Resp. Opp'n at 8–10.

The RCA states: "The Borrower shall pay . . . all out-of-pocket costs and expenses (including, without limitation, the reasonable fees, charges and disbursements of outside counsel and the allocated cost of inside counsel) incurred by the Lender in connection with the enforcement or

10

protection of its rights in connection with this Agreement . . . ." RCA at ¶ 8(f). CBL argues that because this provision does not refer to a specific percentage, N.C. Gen. Stat. § 6-21.2(2) applies. See [D.E. 60] 15; [D.E. 69] 4–5. Section 6-21.2(2) specifies that if a contract "provides for the payment of reasonable attorneys' fees by the debtor, without specifying any specific percentage, such provision shall be construed to mean fifteen percent (15%) of the 'outstanding balance' owing on said note, contract or other evidence of indebtedness." N.C. Gen. Stat. § 6-21.2(2). AFA argues that the RCA's language and North Carolina law require proof of out-of-pocket fees and expenses or evidence of reasonableness. See Resp. Opp'n at 8–9.

Under N.C. Gen. Stat. § 6-21.2(2), where the contract provides for reasonable attorneys' fees, 15% recovery is allowed and a party need not submit a supporting affidavit showing the attorneys' actual billings or usual rates. See Jennings Commc'ns Corp. v. PCG of Golden Strand, Inc., 126 N.C. App. 637, 641–42, 486 S.E.2d 229, 232–33 (1997); Trull v. Cent. Carolina Bank & Tr., 124 N.C. App. 486, 493–94, 478 S.E.2d 39, 44 (1996), aff'd in part, review dismissed in part, 347 N.C. 262, 490 S.E.2d 238 (1997); Inst. Food House, Inc. v. Circus Hall of Cream, Inc., 107 N.C. App. 552, 558, 421 S.E.2d 370, 373–74 (1992); RC Assocs. v. Regency Ventures, Inc., 111 N.C. App. 367, 372–73, 432 S.E.2d 394, 397 (1993); W.S. Clark & Sons, Inc. v. Ruiz, 87 N.C. App. 420, 422–23, 360 S.E.2d 814, 816 (1987). But cf. Bombardier Cap., Inc. v. Lake Hickory Watercraft, Inc., 178 N.C. App. 535, 540–42, 632 S.E.2d 192, 196–97 (2006). Under North Carolina law, even if the 15% amount exceeds the actual attorneys' fees incurred, such an award is not a "windfall" and is the statutorily determined reasonable amount. See, e.g., Trull, 124 N.C. App. at 493–94, 478 S.E.2d at 44.

The RCA allows for reasonable attorneys' fees and does not specify a percentage. Therefore, N.C. Gen. Stat § 6-21.2(2) applies and 15% of the outstanding indebtedness, as defined in that statute, constitutes a reasonable attorneys' fee. North Carolina law does not require proof of actual attorneys' fees incurred.

11

IV.

In sum, the court GRANTS plaintiff's motion for summary judgment [D.E. 59]. Not later than January 7, 2022, plaintiff shall submit the calculation of its damages and attorney's fees consistent with this order.

SO ORDERED. This _22_ day of December, 2021.

JAMES C. DEVER III
United States District Judge